**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

WILLIE JACOBS, ET AL.                    CIVIL ACTION NO. 04-2492

VERSUS                                   JUDGE S. MAURICE HICKS, JR.

CITY OF SHREVEPORT, ET AL.               MAGISTRATE JUDGE HAYES

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 22) filed by Defendants, the City of Shreveport ("the City"), Chief of Police Michael Campbell ("Chief Campbell"), and Officer Jason Persons ("Officer Persons"). Defendants seek dismissal of all of Plaintiffs' claims. Plaintiffs, Willie Jacobs and Michael Jacobs' two minor children, oppose the Motion for Summary Judgment. See Record Document 37. For the reasons assigned herein, Defendants' Motion for Summary Judgment is **GRANTED**.

**I.    BACKGROUND.**

On December 1, 2003, the Shreveport Police Department received a phone call from a concerned citizen in the Highland area of Shreveport. See Record Document 22, Exhibits 1, 5, 6 & 13. The citizen reported that there was ongoing drug dealing next to his home, specifically in front of 1710 Rex Avenue. See id., Exhibits 1, 5 & 6.    City of Shreveport Police Officer Persons, assisted by Officer Lowell Bowen ("Officer Bowen") in another unit, was dispatched to investigate the signal 12 activity[1] at 1710 Rex Avenue. See id., Exhibits 1 & 13. Officer Persons was in a marked Shreveport Police Department patrol unit. See id., Exhibit 1. As Officer Persons arrived on the scene of 1710 Rex

_____

[1]Signal 12 is a police department reference to suspected drug activity. See Record Document 22, Exhibit 1.

Avenue, he observed a car quickly leave from in front of the residence.  See id., Exhibits 1 & 4.  Officer Bowen, who was directly behind Officer Persons in another patrol unit, also observed the vehicle drive away from 1710 Rex Avenue.  See id., Exhibit 13, ¶ 1.  The driver of the vehicle was a white male, later identified as David Horn ("Mr. Horn"), and the passenger was a black male, later identified as Michael Jacobs ("Mr. Jacobs").  Officer Persons also recalled that Mr. Jacobs was riding low in the passenger seat and was looking back towards the patrol unit as it approached the vehicle.  See id., Exhibit 1. Officer Persons stated in an affidavit that "because the vehicle left quickly as soon as I came into view and based upon my experience, the nature of the call, drug activity occurring in front of the residence at that location, as well as the suspicious behavior of the passenger, it appeared to me that this vehicle was involved in the drug activity that I was dispatched to investigate."  Id., Exhibit 1 at ¶ 2.

After observing the vehicle drive away from 1710 Rex Avenue, Officer Persons activated the overhead lights on his patrol unit.  See id., Exhibit 1.  Officer Persons then performed a traffic stop of the vehicle to investigate the suspected drug activity.  See id., Exhibits 1 & 4.  The traffic stop took place on East Olive Street near its intersection with Jenkins Street.  See id., ¶ 5.  During the traffic stop, Officer Persons exited his patrol unit, approached the driver's side of the vehicle, and asked the driver, Mr. Horn, to exit the vehicle.  See id., Exhibit 4.  During the traffic stop, Officer Persons told Mr. Horn that the reason he had pulled the vehicle over was due to a report that there was drug activity going on in front of the house that the vehicle had pulled away from.  See id.

Shortly after he initiated the traffic stop, Officer Bowens arrived on the scene to assist Officer Persons.  See id., Exhibit 13, ¶ 1.  Officer Bowen, at the direction of Officer

Persons, checked Mr. Jacobs, the passenger of the vehicle. See id., Exhibit 4. Officer Bowen asked Mr. Jacobs to exit the vehicle so that Mr. Horn could obtain insurance verification from the glove box. See id., Exhibits 4 & 13. Officer Bowen recalled that Mr. Jacobs appeared to be nervous and had on baggy clothing, in which he could conceal a weapon. See id., Exhibit 13, ¶ 2. Due to his experience, he also knew that weapons were frequently used in connection with drug activity in the Highland area. See id. Therefore, Officer Bowen decided to perform a pat down search of the passenger. See id. As Officer Bowen began the pat down search, Mr. Jacobs fled on foot into the street. See id., Exhibits 3 & 13. Officer Bowen grabbed Mr. Jacobs and tried to control him, but Officer Bowen's attempts were to no avail. See id.

Officer Persons witnessed the developing situation between Officer Bowen and Mr. Jacobs. Specifically, Officer Persons observed Mr. Jacobs break away from Officer Bowen and flee on foot with Officer Bowen in tow. See id., Exhibit 1. Officer Persons observed Mr. Jacobs and Officer Bowen struggling in the street. See id., Exhibits 1 & 4. While in the street, Officer Persons attempted to assist Officer Bowen in gaining control of Mr. Jacobs. See id. At this point, Officer Persons believed that Mr. Jacobs had committed a battery against Officer Bowen. See id., Exhibit 1.

During the struggle in the street, Officer Persons struck Mr. Jacobs several times on the leg with a collapsible 24 inch police baton.[2] See id., Exhibits 1 & 4. Officer Persons stated that he took this action against Mr. Jacobs, who was resisting, in order to provide the most safety for the suspect and the officers. See id., Exhibit 1. Officer Persons also

_____

[2]The leg is considered a "green area," an appropriate area to use a collapsible 24 inch police baton to control a resisting suspect. See Record Document 22, Exhibit 1, ¶ 8.

stated that his actions were an attempt to get Mr. Jacobs on the ground so that he could be handcuffed and the matter investigated safely. See id. The efforts to control Mr. Jacobs were to no avail and he broke free and ran behind houses located on Jenkins Street. See id., Exhibit 1, ¶ 8.[3]

Officer Persons recalled that he caught Mr. Jacobs near the top of a slope in the backyard of a residence located at 1848 Jenkins Street. See id., Exhibit 1, ¶ 9. Officer Persons grabbed Mr. Jacobs around the upper body and head and the two men fell to the ground. See id. Officer Persons also recalled that the backyard was dark and due to the terrain of the backyard, it was possible that Mr. Jacobs stumbled, allowing him to catch Mr. Jacobs. See id. Officer Persons stated that Mr. Jacobs resisted strenuously while the two men were on the ground and that he tried to control Mr. Jacobs by holding his upper body. See id., Exhibit 1, ¶ 10. At this time, Officer Persons was asking for assistance from other officers and stated that he believed he could control Mr. Jacobs until help arrived. See id., Exhibits 1 & 4. Officer Persons also recalled that Mr. Jacobs hit him repeatedly during the struggle. See id., Exhibit 1, ¶ 10; see also Record Document 37, Exhibit 3 at 39. Officer Persons stated that Mr. Jacobs' said repeatedly that he could not breathe. See id., Exhibit 1, ¶ 10. Yet, Officer Persons stated in his deposition that he knew "nothing was stopping [Mr. Jacobs] from breathing because if you can't breathe you can't talk" and "he was talking

---

[3]Officer Bowen did not pursue Mr. Jacobs on foot. Instead, as Officer Persons continued to chase Mr. Jacobs on foot, Officer Bowen got back into his patrol unit and drove north in order to try to get ahead of Mr. Jacobs. See id., Exhibit 13, ¶ 3. However, Officer Bowen could not find where Officer Persons and Mr. Jacobs were located. See id. Officer Bowen recalled that he drove around the block and returned to the original location of the traffic stop. See id. He then heard shots fired, reported the shots fired on his radio, and ran to where he heard the shots occur. See id., Exhibit 13, ¶ 4.

pretty well." Record Document 37, Exhibit 3 at 49. Officer Persons also believed that Mr. Jacobs was saying that he could not breathe so that Officer Persons would loosen his hold on him. See Record Document 22, Exhibit 1, ¶ 10. Officer Persons also recalled that Mr. Jacobs reached for his gun several times during the struggle. See id., ¶ 11.

Demarkus Williams ("Mr. Williams") lived at 1848 Jenkins Street and the struggle between Officer Persons and Mr. Jacobs took place in his backyard. See Record Document 22, Exhibit 8. He stated that he was in his backyard working on his car and saw a police officer chase someone through the yard into the rear area of his backyard. See id. Mr. Williams could not see the struggle because it was dark, his backyard slopes downhill, and bushes blocked his view; however, he could hear the struggle. See id. Specifically, he heard the officer yelling "stop reaching for my gun" and heard the other individual yell "I can't breathe." Id. After hearing the officer yell "stop reaching for my gun" several times, Mr. Williams went to the street in front of his house to try to flag down another officer. Id.[4]

Realizing that he was losing control of the situation, Officer Persons used one hand to key the microphone on his radio, which was located on his belt, so that he could alert other officers as to his location. See Record Document 22, Exhibit 1, ¶ 11. It was at this time that Officer Persons employed a carotid neck restraint[5] against Mr. Jacobs. See id.;

---

[4]Mr. Williams was not in the backyard at the time the shots were fired, rather he heard the shots when he was in front of his house attempting to flag down other officers. See Record Document 22, Exhibit 8.

[5]During his deposition, Officer Persons described applying a lateral vascular neck restraint ("LVNR") against Mr. Jacobs. See Record Document 37, Exhibit 3 at 32. Officer Persons described the LNVR as taking his right arm and using his bicep and forearm and wrapping his arm around the suspect's head underneath the chin. See id. at 33. Officer

see also Record Document 37, Exhibit3 at 32. Officer Persons stated that he was taught at the Shreveport Police Academy to employ the carotid neck restraint technique when he was in fear of receiving great bodily injury and, at that time, he believed that Mr. Jacobs was trying to get his gun and he felt like he could not control Mr. Jacobs much longer. See Record Document 22, Exhibit 1, ¶ 11. Officer Persons stated that at first he did not believe the carotid neck restraint was successful, but then he felt as if Mr. Jacobs was beginning to calm down and relax, so he relaxed his grip on Mr. Jacobs. See id.

Shortly after Officer Persons relaxed his grip on Mr. Jacobs, Officer Persons recalled that Mr. Jacobs turned quickly towards him and struck him in the face with an object Officer Persons believed to be a brick.[6] See id., ¶ 12. According to Officer Persons, the blow stunned him and he completely released Mr. Jacobs. See id. Officer Persons stated that Mr. Jacobs then struck him again and began coming towards him. See id. Officer Persons attested that he had been hit in the face, had lost his glasses, and was having difficulty seeing in the dark. See id. Officer Person stated that he feared Mr. Jacobs would strike him again, incapacitate him, and then gain control of his weapon. See id. Officer Persons began to stand up and noted that Mr. Jacobs also began to stand. See id. Officer Persons also recalled that Mr. Jacobs was once again grabbing at his gun. See

---

Persons further stated that he was trained to use the LVNA as a way to cause "people to lose consciousness, get light headed and lose the will to fight." See id. at 33-34. Based on the record evidence, this Court believes that the LNVR and carotid neck restraint are one and the same.

[6]After the shooting was over, Officer Persons did not see a brick on the ground. See Record Document 22, Exhibit 1, ¶ 13. However, he saw that his police radio was on the ground and believes Mr. Jacobs struck him with the radio. See id. Pictures of the radio after the shooting also show blood on the radio. See Record Document 37, Exhibit 6.

id. Officer Persons recalled that just as he was removing his gun from his holster, Mr. Jacobs was again going for the gun. See id. Officer Persons fired several shots very quickly until Mr. Jacobs went down. See id. Officer Persons stated that he used lethal force because he believed that Mr. Jacobs was attempting to disarm him and that he would be killed if he did not use lethal force. See id.

Officer Persons shot Mr. Jacobs four times. See Record Document 37, Exhibit 1. Mr. Jacobs was taken to Louisiana State University Health Sciences Center where he was later pronounced dead. See id. Officer Persons did receive injuries to his face, namely his nose and lips, as a result of the struggle with Mr. Jacobs. See Record Document 22, Exhibit 7.

On November 29, 2004, several surviving relatives of Mr. Jacobs filed suit asserting federal and state law claims arising from the fatal shooting of Mr. Jacobs by Officer Persons. See Record Document 1. The named defendants in the suit were Officer Persons, the City of Shreveport, Chief of Police Mike Campbell, Mayor Keith Hightower, City Administrative Officer Kenneth Antee, Tom Cody (alleged to be "head of Risk Management"), and Caddo Parish Sheriff Steve Prator. See id. Sheriff Prator was never served and never appeared voluntarily; therefore, all claims against Sheriff Prator were dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m) and Local Rule 41.3W. See Record Documents 13 & 15. On May 6, 2005, all other Defendants joined in filing a Motion to Dismiss. See Record Document 6. On December 13, 2005, this Court granted in part and denied in part a Motion to Dismiss filed by all Defendants. See Record Document 15. After such ruling, the remaining plaintiffs in this case are Willie Jacobs, the surviving spouse of Mr. Michael Jacobs, and the two minor children of Mr.

Jacobs, both of whom are represented by their mothers.  The remaining claims are a Title 42, United States Code, Section 1983 claim for violation of the Equal Protection Clause, a Title 42, United States Code, Section 1983 claim for violation of the Fourth Amendment (excessive force), and state law survival and wrongful death actions.[7]  The remaining defendants are Officer Persons, Chief Campbell, and the City of Shreveport.

On August 9, 2006 Defendants, the City of Shreveport, Chief Mike Campbell, and Officer Jason Persons, filed a Motion for Summary Judgment  (Record Document 22) seeking dismissal of all of Plaintiffs' claims.  Plaintiffs oppose the Motion for Summary Judgment.  See Record Document 37.

## II.     LAW AND ANALYSIS.

### A.     Summary Judgment Standard.

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c);  New York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir. 1996).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary

---

[7]In opposing the Motion for Summary Judgment and in the recently submitted joint proposed pretrial order, Plaintiffs seem to assert that the City of Shreveport and Chief Campbell denied Mr. Jacobs of his constitutional right to medical care in violation of the Fifth Amendment of the United States Constitution and the due process clause of the Louisiana Constitution.  Plaintiffs allege that "it is also without dispute that the Shreveport EMS did not arrive until after [Mr.] Jacobs was on the ground for at least twenty minutes, and died prior to the arrival of Shreveport EMS."  Record Document 37-1 at 10.
At the outset, the Court notes that Defendants deny the accuracy of the aforementioned statement regarding the time it took for EMS to arrive on the scene.  More importantly, Plaintiffs made no claim for alleged delay in medical treatment in their lengthy complaint.  Because Plaintiffs made no claim in their complaint that Mr. Jacobs did not receive adequate medical treatment, such claim is simply not before this Court.

judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Gunaca v. Texas, 65 F.3d 467, 469 (5th Cir. 1995). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting Celotex, 477 U.S. at 323-25, 106 S. Ct. at 2552). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Little, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075); see also S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." McCallum Highlands v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995), as revised on denial of rehearing, 70 F.3d

26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id., 477 U.S. at 248, 106 S. Ct. at 2510.

With these principles in mind, the Court now turns to a review of the claims at issue.

### B.      Title 42, United States Code, Section 1983.

Section 1983 provides that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Section 1983 does not create substantive rights, rather it is simply a procedural vehicle that provides a remedy for violation of the rights that it designates. See Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997). Therefore, "an underlying constitutional or statutory violation is a predicate to liability under § 1983." Id.

### C.      Qualified Immunity.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Estate of Davis ex rel. McCully v. City of North Richland Hills</u>, 406 F.3d 375, 380 (5th Cir. 2005) (citations omitted).[8] "Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." <u>Id.</u> (citation omitted). Qualified immunity is more than a mere defense to liability, rather it provides immunity from suit. <u>See id.</u>

The Fifth Circuit has reasoned that before a district court adjudicates the merits of a plaintiff's claims, such plaintiff must overcome the bar of qualified immunity. <u>See id.</u> (citations omitted). Once the issue of qualified immunity is raised, a plaintiff has the burden of rebutting the defense by demonstrating that the government official's allegedly wrongful conduct violated clearly established law. <u>See id.</u> The Fifth Circuit does not command that the government official demonstrate that he did not violate clearly established federal rights because the precedent of this Circuit places such burden upon the plaintiff. <u>See id.</u> "Qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law." <u>Id.</u>

Simply put, the qualified immunity shield is broad and protects actions, even mistakes, that are reasonable under the existing law. <u>See</u> <u>Fraire v. City of Arlington</u>, 957 F.2d 1268 (5th Cir. 1992). It is only when a plaintiff (1) establishes a violation of a clearly established right; and (2) shows that the government official's conduct was objectively

---

[8]Qualified immunity does not apply to claims against a municipality such as the City of Shreveport, but individual defendants may assert qualified immunity from the claims against them for money damages.

unreasonable in light of the clearly established law at the time of the violation that such government official will not be entitled to qualified immunity.  See Fontenot v. Cormier, 56 F.3d 669, 673 (5th Cir. 1995); Siegert v. Gilley, 500 U.S. 226, 111 S. Ct. 1789 (1991).  The Fifth Circuit has stated that "[i]f reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity."  Fraire, 957 F.2d at 1273.

### D.    Section 1983 Claims Against Officer Persons.

Plaintiffs argue that Officer Persons' actions on December 1, 2003 violated not only Mr. Jacobs' Fourth Amendment right to be free from excessive force but also his right to be accorded equal protection under the Fourteenth Amendment.  See Record Document 1, ¶ 35.  Officer Persons has plead qualified immunity.

The Court will first address Plaintiffs' equal protection claim.  "The Equal Protection Clause directs that persons similarly situated should be treated alike."  Williams v. Bramer, 180 F.3d 699, 705 (5th Cir. 1999).  "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class."  Id.  Further, the party must demonstrate that the purposeful discrimination motivating the state action caused the complained-of injury.  See Johnson v. Rodriguez, 110 F.3d 299, 306-307 (5th Cir. 1997).  "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group."  Id.

There is very little evidence and/or reference to race in the complaint and summary judgment record in relation to Officer Persons' personal conduct.  In the complaint, Mr.

Jacobs is identified as an African-American male. See Record Document 1, ¶ 14. Officer Persons is a Caucasian male. See Record Document 22, Exhibit 7. Plaintiffs further allege in their complaint that Officer Persons, a Caucasian male, had a "personal vendetta" against Mr. Horn, the driver of the vehicle, who is also a Caucasian male. See Record Document 1, ¶ 16; Record Document 22, Exhibit 4.

Further, Plaintiffs simply "denied," without any further explanation, Defendants' Statement of Uncontested Fact No. 26, which stated:

> Officer Persons took no action with respect to the suspect due to the suspect's race.

Record Document 22-4. This statement is based on Officer Person's affidavit, wherein he stated that he did not take any action with respect to the suspect because of race. See Record Document 22, Exhibit 1, ¶ 15. Plaintiffs also allege that Officer Persons was following the City's policy of using unnecessary deadly force against African-Americans when he shot Mr. Jacobs. See Record Document 1, ¶ 34. Simply put, Plaintiffs allege, with little or no evidence to support their claim, that Officer Persons' use of deadly force against Mr. Jacobs was based on race. See id., ¶ 38.

Plaintiffs are clearly relying on scant evidence and conclusory allegations to support their equal protection claim. Plaintiffs have failed to come forward with evidence that Officer Persons' allegedly wrongful conduct was intentional or purposeful discrimination based on race, as required by the Equal Protection Clause. The mere scintilla of evidence presented by the Plaintiffs as to the equal protection claim is simply not enough to rebut the asserted defense of qualified immunity. Accordingly, Officer Persons is entitled to qualified immunity as to the equal protection claim and summary judgment is **GRANTED**.

Plaintiffs have also alleged that Officer Persons' violated Mr. Jacobs' Fourth Amendment right to be free from excessive force. The events of December 1, 2003 can be divided into categories: the initial <u>Terry</u> traffic stop, the attempted detention of Mr. Jacobs, the attempted pat down of Mr. Jacobs, the attempted take down of Mr. Jacobs in the street, and the struggle between Mr. Jacobs and Officer Persons in the backyard of the Jenkins Street residence. The record evidence shows that Officer Persons was involved in the initial <u>Terry</u> traffic stop, the attempted take down of Mr. Jacobs, which was part of an attempt to detain Mr. Jacobs, and the struggle with Mr. Jacobs in the backyard of the Jenkins Street residence. Officer Bowen, who is not named as a defendant in the instant lawsuit, was the officer who asked Mr. Jacobs to exit the vehicle and attempted to perform a pat down search.[9] Based on these facts, Plaintiffs' Fourth Amendment excessive force claims against Officer Persons arise from the initial <u>Terry</u> traffic stop, the attempted take down of Mr. Jacobs, and the struggle, which eventually lead to Officer Persons' use of lethal force, with Mr. Jacobs in the backyard of the Jenkins Street residence. Again, Officer Persons has asserted qualified immunity as to any claims arising from the events of December 1, 2003.

**1.      Initial Traffic Stop.**

Plaintiffs seems to allege that the initial traffic stop was unreasonable, arguing that

---

[9]Under Fifth Circuit jurisprudence, no <u>Terry</u> violation results from a pat down search if the searching officer can point to specific and articulable facts suggesting actual physical risk to himself or others. <u>See</u> <u>U.S. v. Jenson</u>, 462 F.3d 399, 407 (5th Cir. 2006). Here, after a review of Officer Bowen's affidavit, the Court believes that Officer Bowen has pointed to specific and articulable facts supporting his decision to perform a pat-down search of Mr. Jacobs.

Officer Persons did not have a reasonable basis to suspect the individuals in the vehicle were involved in drug activity. Plaintiffs further contend that Officer Persons had no basis to detain either the individuals in the vehicle and to further investigate suspected drug activity. The only evidence presented by Plaintiffs in support of their allegation is that Officer Persons admitted the vehicle had not committed a traffic violation and that he stopped the vehicle to get the identification of the occupants. Plaintiffs further allege that because Officer Persons did not see either occupant of the vehicle attempt to sell drugs, the stop of the vehicle was unreasonable.

Searches and seizures of motorists suspected of criminal activity are analyzed under the framework set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968). See U.S. v. Jaquez, 421 F.3d 338, 340 (5th Cir. 2005). An investigative vehicle stop is permissible under Terry only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. See id. An officer's mere hunch or unparticularized suspicion is not sufficient; instead, a minimal level of objective justification for the stop must be present. See id. at 341.

Officer Persons' affidavit evidences reasonable suspicion and articulable facts supporting the belief that criminal activity was afoot, thus justifying the initial Terry stop of the vehicle in which Mr. Jacobs was a passenger. The affidavit states:

> When I approached the location where I had been dispatched I noticed a car quickly leave from in front of that residence. The driver was a white male and the passenger was a black male. The passenger was low in the seat and was looking over the seat towards my patrol unit as I approached because the vehicle left quickly as soon as I came into view and based on my experience, the nature of the call, drug activity occurring in front of the residence at that location, as well as the suspicious behavior of the passenger, it appeared to me that this vehicle was involved in the drug activity that I was dispatched to investigate.

I then performed a traffic stop in order to investigate the suspected drug activity. I had reasonable suspicion that the driver and the passenger were involved in illegal drug activity based upon my experience, the information provided by the dispatcher, and my observations. I also regularly patrol in that area, which was an area with significant problems regarding the sale of narcotics.

Record Document 22, Exhibit 1, ¶¶ 2-3. These facts are also supported by the video from Officer Persons patrol unit, the phone audio from the neighbor reporting the drug activity, and the radio audio from dispatch. See id., Exhibits 4, 5 & 6. For instance, the neighbor and the dispatcher reported black males in front of 1710 Rex Avenue involved in drug activity. Mr. Jacobs, the occupant of the vehicle that was acting suspicious, was a black male. Further, the Court places great weight on the fact that Mr. Jacobs was riding low in his seat, was looking over the seat towards Officer Persons' patrol unit as he approached, and then the vehicle left quickly as soon as Officer Persons came into view. Accordingly, the Court finds that Officer Persons had at least a minimal level of objective justification for the Terry stop, and, therefore, the Terry stop of the vehicle was objectively reasonable in light of the totality of the circumstances and clearly established law. Officer Persons is entitled to qualified immunity for any Section 1983 claims arising out of the initial traffic stop.

## 2.    Attempted Take Down.

The undisputed video evidence shows that when Officer Bowen began to perform a pat down search for officer safety, Mr. Jacobs fled on foot. See Record Document 22, Exhibits 3, 4 & 13. Officer Bowen grabbed Mr. Jacobs to prevent him from fleeing but Mr. Jacobs resisted and fled into the street. See id. The attempted take down of Mr. Jacobs occurred after he fled into the street and it was at this point that Officer Persons became

involved in the struggle with Mr. Jacobs.  See id., Exhibits 1, 3, 4, & 13.

Plaintiffs seem to argue that it was unreasonable for Officer Persons to use force in attempt to place Mr. Jacobs on the ground during the struggle in the street.  The video evidence again shows that Mr. Jacobs was resisting both Officers Bowen and Persons and the audio evinces that repeated instructions by the officers for Mr. Jacobs to "get on the ground" that were disobeyed.  See id., Exhibit 4.  In his affidavit, Officer Persons details how he observed Mr. Jacobs run from Officer Bowen and the ensuing struggle between Officer Bowen and Mr. Jacobs.  See id., Exhibit 1.  Officer Persons attempted to assist Officer Bowen in gaining control of a suspect that was resisting.  See id.  Further, Officer Persons was taught that if a suspect resists, it is appropriate to place the suspect on the ground and to do so quickly in order to provide the most safety for the suspect and the officers.  See id.  Officer Persons further stated that he was taught to use that it was appropriate to utilize a collapsible 24 inch baton by striking a suspect in a "green" area, such as the leg, in order to assist in getting the suspect to the ground.  Id., ¶ 8.  Officer Jacobs admitted that he struck Mr. Jacobs several times on the leg in order to attempt to get him to go to the ground so that he could be handcuffed and the officers could continue to investigate the matter safely.  See id.

Again, the Court has reviewed the video evidence that captures the aforementioned sequence of events and finds that Officer Persons' affidavit conforms to the video.  See id., Exhibit 4.  Further, other than bare and unsupported allegations that the attempted take down was unreasonable, Plaintiffs offer no evidence in support of and cite no authority for the position that Officer Persons was unreasonable in trying to gain control of Mr. Jacobs, who was clearly resisting and struggling, by striking him with the baton in attempt to get Mr.

Jacobs on the ground so that he could be handcuffed.  Accordingly, the Court finds that Officer Persons' involvement in the attempted take down of Mr. Jacobs was objectively reasonable in light of the totality of the circumstances and clearly established law.  Officer Persons is entitled to qualified immunity for any Section 1983 claims arising from his involvement in the attempted take down of Mr. Jacobs.

### 3. Struggle in Backyard of the Jenkins Street Residence Resulting in the Use of Deadly Force.

While Plaintiffs alleged that Officer Persons' actions as to the initial traffic stop and the attempted take down were unreasonable, it is clear that Plaintiffs' key allegation is that Officer Persons' use of deadly force against Mr. Jacobs was in violation of the Fourth Amendment.  The Fourth Amendment protects individuals against "unreasonable searches and seizures."  To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a "seizure" occurred and that the seizure was "unreasonable."  Brower v. County of Inyo, 489 U.S. 593, 599, 109 S.Ct. 1378, 1382-83 (1989).  "While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699 (1985).

The elements necessary to prove an excessive force claim under Section 1983 are a significant injury which resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was objectively unreasonable.  See Carter v. Fenner , 136 F.3d 1000, 1010 (5th Cir. 1998), citing Johnson v. Morel, 876 F.2d 477, 480 (5th Cir.1989) (en banc).  Of importance, this standard "requires a showing that

the force used was not only excessive, but clearly more than the force needed to subdue the threat." Carter, 136 F.3d at 1010. Further, in order to determine the objective reasonableness of the use of force in a particular situation, courts must judge from the perspective of a reasonable officer on the scene. See id., citing Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872 (1989).

Here, there is no dispute that Mr. Jacobs suffered a significant injury. Further, the record supports, and this Court will assume for purposes of the instant Memorandum Ruling, that Mr. Jacobs' death resulted directly and only from the shooting. Thus, the question in this case will center on whether the amount of force used by Officer Persons was clearly excessive and objectively unreasonable. As stated by the Fifth Circuit in Reese v. Anderson, 926 F.2d 494 (5th Cir. 1991):

> The Supreme Court has instructed us on the proper standard for this inquiry:
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Reese, 926 F.2d at 500. In answering the reasonableness question, this Court "must consider the totality of the circumstances." Id. Specifically, this Court must examine whether Mr. Jacobs posed an immediate threat to the safety of the officers or others, and whether Mr. Jacobs was actively resisting arrest. See id. In the context of a fleeing suspect, the Supreme Court has reasoned:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus,

if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Id., citing Garner, 471 U.S. at 11-12, 105 S.Ct. at 1701.

Applying these standards, the Court concludes that Officer Persons' shooting of Mr. Jacobs was reasonable and not excessive. As described by Officer Persons' affidavit, Mr. Jacobs was actively resisting; attempts to use a baton and the carotid neck restraint to gain control of Mr. Jacobs had been unsuccessful; Mr. Jacobs had reached for Officer Persons' gun several times; Mr. Jacobs had struck Officer Persons several times, including once with an object Officer Persons believed to be a brick; Officer Persons was growing tired; Officer Persons had lost his glasses and was having difficulty seeing; and Mr. Jacobs was coming towards Officer Persons. See Record Document 22, Exhibit 1. Under these circumstances, a reasonable officer could well fear for his safety and that of others nearby, namely the other officers in the area who were actively searching for Mr. Jacobs. Officer Persons could reasonably believe that Mr. Jacobs would strike him again with the unknown object he believed to be a brick and/or that Mr. Jacobs would disarm him, take control of his weapon, and use it against him. That is, Officer Persons had probable cause to believe that Mr. Jacobs posed a threat of serious physical harm. See Reese, 926 F.2d at 501. Officer Persons, as stated in his affidavit and confirmed by Mr. Williams, in whose yard the struggle took place, had repeatedly warned Mr. Jacobs to stop reaching for his gun, to no avail. See Record Document 22, Exhibits 1 & 8. Under such circumstances, an officer such as Officer Persons is justified in using deadly force to defend himself and others around him. Further, as stated by Fifth Circuit jurisprudence, in a case such as the instant matter, it is irrelevant that Mr. Jacobs was actually unarmed. See Reese, 926 F.2d at 501.

The Court has also found guidance from the Fifth Circuit in <u>Colston v. Barnhart</u>, 130 F.3d 96 (5th Cir. 1997). In <u>Colston</u>, the Fifth Circuit held that an officer's use of deadly force was objectively reasonable where the suspect had disobeyed orders from officers to get on the ground; the suspect had violently and forcefully resisted the officers' attempts to gain control of him; the suspect quickly subdued both officers and knocked them to the ground with some force; one of the officers was dazed and his vision was blurred; and the officers' earlier attempts to control the suspect with non-deadly force, including hitting him with a baton, had failed. <u>See</u> <u>Colston</u>, 130 F.3d at 99-100. Further, in <u>Colston</u>, the suspect was standing between the officer and another officer who had a weapon that the suspect could have obtained. <u>See id.</u> There were also allegations in <u>Colston</u> that the suspect was attempting to flee; yet, the Fifth Circuit reasoned that the officer "had no way to know whether [the suspect] intended to flee or inflict further injury or death on the officers." <u>Id.</u> at 100. <u>Colston</u> is the perfect example of a case, such as in the instant matter, where the officer was not only faced with rapidly evolving circumstances, but also had to contend with the fact that the suspect had the real opportunity to obtain the officer's weapon. This Court finds, like the <u>Colston</u> court, that an officer in such a situation was objectively reasonable in using deadly force and is entitled to qualified immunity.

Plaintiffs had made much of a purported factual dispute regarding whether Mr. Jacobs was in fact holding or grabbing Officer Persons' gun when the initial or subsequent shots were fired. <u>See</u> Record Document 37-2, ¶ 20. In his affidavit, Officer Persons stated that he recalled that as he stood up Mr. Jacobs was also beginning to stand and he felt Mr. Jacobs grabbing his gun again. <u>See</u> Record Document 22, Exhibit 1, ¶ 12. He further attested in his affidavit that he believed that Mr. Jacobs had hold of his gun as he removed

it and then he fired at Mr. Jacobs.  See id.  Yet, in a statement given on December 1, 2003, Officer Persons stated that Mr. Jacobs did not have hold of his gun, but rather that Mr. Jacobs had grabbed his belt just before he fired his gun.  See Record Document 37, Exhibit 4 at 5.  It is clear that there is a factual dispute between Officer Persons' affidavit and his statement; however, this Court finds that such factual dispute is not material.[10] There is no factual dispute that Mr. Jacobs had grabbed for Officer Persons' gun and/or that he either grabbed the gun or Officer Persons' belt, in the very area where his gun was located, just before Officer Persons fired his gun.  In light of this, this Court cannot say that this minor factual dispute is material to whether lethal force was appropriate under the aforementioned analysis.  Accordingly, the Court finds that Officer Persons had probable cause to believe that Mr. Jacobs posed a threat of serious physical harm and, under such circumstances, Officer Persons was justified in using deadly force to defend himself and others around him. Officer Persons is entitled to qualified immunity and, therefore, summary judgment is **GRANTED**.

### E.    Section 1983 Claims Against Chief Campbell.

Using Section 1983 as their procedural vehicle, Plaintiffs have alleged violation of the constitutional right to be free of excessive force under the Fourth Amendment and violation of the Equal Protection Clause of the Fourteenth Amendment against Chief Campbell.  Plaintiffs seek to hold Chief Campbell liable in both his individual and official

---

[10]Substantive law identifies which facts are material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  Any factual dispute that is irrelevant or unnecessary will not be counted.  See id.

capacities. Their claims against Chief Campbell in his official capacity are tantamount to claims against the City of Shreveport. See Roberts v. City of Shreveport, 397 F.3d 287, 291 (5th Cir. 2005) (citations omitted). The claims against the City of Shreveport will be addressed in turn but the Court will first address the claims against Chief Campbell in his individual capacity.

Plaintiffs allege that Chief Campbell, as the supervisor of Officer Persons, failed to provide the adequate training to Officer Persons regarding arrest procedures, the proper use of firearms, and the use of deadly force. See Record Document 1, ¶ 31. Specifically, Plaintiffs argue that "[Mr.] Jacobs was killed . . . because Chief Campbell failed to train [Officer] Persons to focus on the presence of factors meeting the level of probable cause to determine if [Mr.] Jacobs was a threat to his life rather than subjective factors such as fear." Record Document 37-1 at 9.[11]

Supervisory officials such as Chief Campbell can not be held liable under Section 1983 for the actions of subordinates, such as Officer Persons, on any vicarious liability or respondeat superior liability theories. See Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005). Instead, Plaintiffs must show that the conduct of Chief Campbell denied Mr. Jacobs of his constitutional rights. See id. Plaintiffs in the instant matter have alleged a failure to train/improper training claim against Chief Campbell. Therefore, they must prove that "(1) the supervisor either failed to . . . train the subordinate official; (2) a causal link exists between the failure to train . . . and the violation of [Mr. Jacob's] rights; and (3) the failure to train . . . amounts to deliberate indifference."

---

[11]The Court found no allegation in the record that Chief Campbell was personally involved in the shooting of Mr. Jacobs.

Id.

As to the third prong, the Fifth Circuit has defined deliberate indifference as "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. To act with deliberate indifference, the municipal "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. A showing of negligence or gross negligence does not rise to the level of deliberate indifference. See id. Further, "actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." Id. To meet the stringent standard of deliberate indifference, a plaintiff generally must prove not only a pattern of violations, but also that the inadequacy of the training was obvious and obviously likely to result in a constitutional violation. See id. Simply put, for Chief Campbell to be held liable as Officer Persons' supervisor, Plaintiffs must establish at least a pattern of violations (fairly similar to what ultimately transpired) on the part of Officer Persons so that the failure of Chief Campbell to respond with different training reflects a deliberate or conscious choice to endanger constitutional rights. See id. at 381-83; see also Roberts v. City of Shreveport, 397 F.3d 287, 292 (5th Cir.2005).

Plaintiffs have given much attention to the first prong of the supervisory liability analysis, arguing that Chief Campbell's training on the issue of deadly force was inadequate and improperly focused on an officer's subjective beliefs rather than objective factors. See Record Document 37-1 at 9; 37-2, ¶¶ 27 & 29. Notwithstanding, Plaintiffs have failed to adequately address the third prong of the supervisory liability analysis, i.e.,

the deliberate indifference requirement. The Court has scoured the record in this case and has found nothing in the record that even remotely suggests a prior pattern by Officer Persons of violating constitutional rights by employing excessive or deadly force against a third party. See Estate of Davis, 406 F.3d at 382. Further, even assuming that Officer Persons had such a prior record, there is nothing in the record to suggest that Chief Campbell had notice of the pattern of similar constitutional violations. See id. at 383. In fact, in his affidavit, Chief Campbell specifically stated that he "was not aware of any need for additional lethal force or other training on the part of Officer Persons." Record Document 22, Exhibit 2, ¶ 4. Therefore, Plaintiffs cannot establish that any alleged failure to train on the part of Chief Campbell reflected a deliberate or conscious choice to endanger human rights. See Estate of Davis, 406 F.3d at 383.

The Court finds that "there is no conduct [on the part of Officer Persons] from which it could be reasonably concluded that [Chief Campbell] made a deliberate or conscious choice to endanger constitutional rights." Id. at 385.[12] Accordingly, Chief Campbell is entitled to qualified immunity and summary judgment in favor of Chief Campbell, in his individual capacity, is **GRANTED**.[13]

---

[12]There no material issue on the record with respect to the question of whether Chief Campbell was deliberately indifferent and because the instant matter falters on this requirement, the Court need not address the other two prongs of supervisory liability, i.e., inadequate training and a causal link.

[13]While Plaintiffs have not asserted the applicability of the single incident exception, this Court, out of an abundance of caution, finds that such exception is inapplicable to this case. For the single incident exception to apply, the plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation. See Brown v. Bryan County, 219 F.3d 450, 461 (5th Cir. 2000). The Fifth Circuit "has been highly reluctant to permit this exception to swallow the rule that forbids mere respondeat

### F. Section 1983 Claims Against the City of Shreveport.

Next, Plaintiffs assert Section 1983 claims against the City of Shreveport and Chief Campbell in his official capacity,[14] arguing that Mr. Jacobs' constitutional rights to be free from excessive force under the Fourth Amendment and to be accorded equal protection under the Fourteenth Amendment were violated. Specifically, Plaintiffs allege (1) that the City inadequately trained its police officers as to the proper uses of force; and (2) that "the City of Shreveport and the Shreveport Police Department had a policy of using deadly force against African-American citizens, whom the officers believed were disobeying their verbal commands to stop, which such policy was followed herein and was a moving force in the actions of [Officer] Person[s], rather than resorting to nonlethal force when it was feasible to do so." See Record Document 1, ¶¶ 31-32.

Section 1983 applies to municipalities such as the City of Shreveport, but just as in the case with supervisor liability against Chief Campbell, vicarious liability principles are inapplicable. Rather, it is when execution of a government's policy or custom inflicts the injury that the government as an entity is responsible under Section 1983. See Monell v. Dep't of Social Services of New York, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38 (1978).

---

superior liability." Roberts, 397 F.3d at 295.

This is not a case where Officer Persons received no training. See Record Document 22, Exhibit 2. In fact, Chief Campbell oversaw a significant training regimen for Officer Persons and the other police officers under his command. See id. Further, there is no evidence from the record evidence that Officer Persons has been involved in any cases involving the improper use of deadly force. The Court finds neither "unmistakable culpability" on the part of Chief Campbell nor "clearly connected causation" in this case; therefore, the single incident exception is not applicable in this case. Brown, 219 F.3d at 461.

[14]Again, Plaintiffs' claims against Chief Campbell in his official capacity are tantamount to claims against the City of Shreveport.

To establish a municipality's liability for a constitutional tort, the plaintiff must show first, that the municipality adopted a policy with "deliberate indifference" to its known or obvious consequences, and second, that the municipality was the "moving force" behind the constitutional violation. Id.

Since Monell, the Fifth Circuit has defined "official policy" as:

(1)     A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

(2)     A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

Nobby Lobby, Inc. v. City of Dallas, 970 F.2d 82, 92 (5th Cir. 1992). The Fifth Circuit requires that a Section 1983 plaintiff plead specific facts, not merely conclusory allegations, with sufficient particularity to meet all the elements of recovery. See Fraire v. City of Arlington, 957 F.2d 1268, 1278 (5th Cir. 1992). "This heightened pleading requirement applies to allegations of municipal custom or policy." Id. Here, Plaintiffs will have to provide specific facts to support their bald assertions that the City's policies, or its failure to implement additional policies as to training, violated Mr. Jacobs' constitutional rights and contributed to his unfortunate death. See id.

As to deliberate indifference, courts have generally held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in

contact. . . .  Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1205 (1989).  Stated another way, to establish deliberate indifference, a plaintiff must show at least a pattern of violations (fairly similar to what ultimately transpired) so that the failure of the city to respond with different training or better supervision reflects a deliberate or conscious choice to endanger constitutional rights.  Estate of Davis v. City of North Richland Hills, 406 F.3d 375, 381-83 (5th Cir.2005); Roberts, 397 F.3d at 292.

In support of their municipal liability claim against the City, Plaintiffs describe five incidents in which they contend a Shreveport police officer shot an unarmed African-American who either led police on a car chase or refused verbal commands to stop.  See Record Document 1, ¶ 32.  The shootings are alleged to have occurred between 1998 and 2003.  See id.  The police department investigated each shooting and found the use of deadly force against the unarmed African-Americans to not be inconsistent with its policies and training.  See id.  After the incidents, Plaintiffs allege that the City of Shreveport supported the actions of the police officers, publicly declared that their actions were consistent with the training, policy and procedures of the City police department, did not discipline the police officers involved, and did not provide the officers involved additional training in the proper use of deadly force.  See id., ¶¶ 32-34.  Plaintiffs allege that these five incidents demonstrate that the City of Shreveport, via the Shreveport Police Department, has a "history, practice, policy, and/or culture of using deadly force against African Americans but not against non-African Americans."  Id., ¶ 38.  Further, Plaintiffs

contend that the City and Chief Campbell were "aware that its officers were using deadly force against unarmed African Americans . . . when neither the officers' lives nor lives of others were [sic] in danger, and . . . took no actions to prevent other Shreveport police officers from committing similar unjustified shooting." Id., ¶ 34.

The Court notes that Plaintiffs have identified with some degree of specificity a purported pattern of similar incidents that are consistent with the informal policy that they allege exists. Now, Plaintiffs must prove a causal link between the informal policy alleged and deliberate indifference by the City or Chief Campbell with respect to training and/or supervision of officers.

Here, the Court simply does not find a case where any alleged failure to train or supervise was a "deliberate" or "conscious" choice by the City or Chief Campbell. Defendants have provided this Court with the affidavit of Chief Campbell wherein he states that he has been the Chief of Police of Police since June 2003 and that prior to becoming the Chief of Police, he was the director of the Shreveport Police Academy from 1999 forward. See Record Document 22, Exhibit 2, ¶ 1.[15] The affidavit clearly evidences personal knowledge on the part of Chief Campbell as to the training and supervision of officers of the Shreveport Police Department. Chief Campbell stated that "as the academy director, [he] ensured that the Shreveport Police Department adequately trained officers

---

[15]Because he was director in 1999 and 2000, Chief Campbell is personally familiar with the training provided to Officer Persons at the Shreveport Police Academy in 1999 and 2000 when Officer Persons attended the academy. See Record Document 22, Exhibit 2, ¶ 1. Chief Campbell was also familiar with the training provided to Officer Persons regarding carotid neck restraints and stated that Officer Persons was authorized to utilize that technique if he believed that it was necessary to prevent serious bodily injury to the himself or others. See id., ¶ 3.

regarding the use of force and lethal force." Id., ¶ 2. He specifically described a rigorous 16 week academy that provided the officers with hundreds of hours of training. Id. Chief Campbell also described in great detail the Shreveport Police Department's comprehensive policy on the use of lethal force and stated that officers undergo extensive training on the application of that policy. Id. The comprehensive training procedure on the use of lethal force includes classroom instruction, scenario training, simulated ammunition training, and the use of low light settings. Id. Finally, Chief Campbell stated that he believed that the Shreveport Police Department's "training was adequate and was not aware of any need for additional lethal force or other training on the part of Officer Persons." Chief Campbell went on to attest that he was not deliberately indifferent to the rights of suspects such as Mr. Jacobs and that there is no custom, policy, or practice by the Shreveport Police Department of employing unconstitutional uses of force or lethal force, detentions without reasonable suspicion, or arrests without probable cause. See id., ¶¶ 4-5. Likewise, Chief Campbell stated that it is not the custom, policy, or practice of the Shreveport Police Department to use force or lethal force or to detain or arrest suspects due to their race. See id., ¶ 5.

Based on this affidavit, it is abundantly clear to the Court that "the need for more or different training" as to the uses of force, including lethal force, to officers of the Shreveport Police Department was not "so obvious, and the inadequacy so likely to result in violation of constitutional rights, that the policymakers of the [C]ity can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390, 109 S.Ct. at 1205. And while Plaintiffs have failed to show that Officer Persons or any other officer was unsatisfactorily trained as to the use of force, Plaintiffs have also not accounted for the fact

that any shortcomings in Officer Persons' actions may have resulted from factors other than his training and/or any informal policy of the Shreveport Police Department. See id., 109 S.Ct. at 1206. Simply put, Plaintiffs have not condemned the adequacy of the training program and/or the supervision of the officers of the Shreveport Police Department and, additionally, have not proven that any deficiency in the City's training or supervising actually caused indifference to Mr. Jacobs' constitutional rights. [16] Accordingly, Plaintiffs' Section 1983 claims against the City of Shreveport and Chief Campbell in his official capacity fail as a matter of law.

### G.    State Law Claims.

Plaintiffs allege that Defendants' conduct on December 1, 2003 constituted negligence, gross negligence, intentional endangerment and callous indifference to the life and safety of the decedent, assault and battery, excessive force, false imprisonment, wrongful death and loss of enjoyment of life, and intentional infliction of emotions distress, all in violation of Louisiana Civil Code article 2315 and the laws of the State of Louisiana. See Record Document 1, ¶¶ 29 &36. Because this Court has found that Officer Persons used reasonable force under the circumstances and is entitled to qualified immunity as to all Section 1983 claims, neither Officer Persons nor the City of Shreveport are liable for the

---

[16]Plaintiffs rely heavily upon Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985), in support of their contention that Chief Campbell's tacit endorsement or passive ratification of Officer Persons' actions equate to municipal liability. However, as noted by Defendants, Plaintiffs failed to note that "Grandstaff . . . does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy." Coon v. Ledbetter, 780 F.2d 1158, 1161 (5th Cir. 1986). In fact, "the Grandstaff panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations." Id.

state law claims plead by Plaintiffs including negligence theories, false imprisonment, assault and battery, vicarious liability, and any other Louisiana tort law theories. <u>See</u> <u>Bellamore v. City of Westwego</u>, No. Civ. A. 00-1511, 2001 WL 214030, at *3 (E.D.La. March 5, 2001) (citing <u>Kyle v. City of New Orleans</u>, 353 So.2d 969 (La.1977) (stating that "because the officers used reasonable force under the circumstances, the Court finds neither the arresting officers nor the City of Westwego liable for the state law claims plead by plaintiffs including negligence, false arrest, trespass, battery, or respondeat superior.").

Plaintiffs also allege that Defendants' conduct violated the Louisiana Constitution, specifically Mr. Jacobs' right to be secure in his person, property, and effects against unreasonable searches, seizures, or invasions of privacy. <u>See</u> Record Document 1, ¶ 35. Based on this allegation, Plaintiffs seem to allege a violation of Article I, Section 5 of the Louisiana Constitution. Louisiana federal district courts have noted that privacy principles embodied in the Fourth Amendment have been incorporated into Article I, Section 5 of the Louisiana Constitution. <u>See</u> <u>Todd v. City of Natchitoches, Louisiana</u>, 238 F.Supp.2d 793, 798 -799 (W.D.La. 2002); <u>see also</u> <u>Molette v. City of Alexandria</u>, No. Civ. A CV040501A, 2005 WL 2445432, at *1 (W.D.La. September 30, 2005) & <u>State v. McKinney</u>, No. 93-KA-1425 (La.App. 4 Cir. 5/17/94)), 637 So.2d 1120, 1125. Like the Fourth Amendment, Article I, Section 5 prohibits unreasonable search and seizures. <u>See id.</u> Again, because the Court has found that Officer Persons is entitled to qualified immunity as to the Section 1983 claims arising under the Fourth Amendment, there is likewise no liability on the part of Officer Persons or the City of Shreveport for violation of Article I, Section 5 of the Louisiana Constitution.

## III.    CONCLUSION.

Based on the foregoing analysis, the Court finds that Officer Persons is entitled to qualified immunity as to the Section 1983 claims asserted against him in his individual capacity; that Chief Campbell is entitled to qualified immunity as to the Section 1983 claims asserted against him in his individual capacity; that Plaintiffs' Section 1983 claims against the City of Shreveport and Chief Campbell in his official capacity fail as a matter of law; and Plaintiffs' state law claims fails as a matter of law.  Accordingly, Defendants' Motion for Summary Judgment (Record Document 22) be and is hereby **GRANTED**.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 8th day of November, 2006.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE